**KERR CONSTRUCTION PAVING COMPANY, INC., et al., Respondents,**

v.

**Ghassan KHAZIN and Walter Waugh, Appellants.**

No. WD 53003.

Missouri Court of Appeals, Western District.

Dec. 9, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 27, 1998.

Application to Transfer Denied March 24, 1998.

Judy L. Curran, Khazin and Waugh, Kansas City, for appellants.

Timothy C. Meyer, John B. Meyer, Kansas City, for respondents.

Before EDWIN H. SMITH, P.J., and BERREY and ELLIS, JJ.

ELLIS, Judge.

On July 7, 1992, Kerr Construction Paving Inc. entered into a contract with the City of

Independence, Missouri, for street improvements to Lake City Valley Road. In exchange for those improvements, Kerr Construction was to receive $153,777.

The City entered into a separate agreement with the Missouri Department of Transportation ("MoDOT") under which the City would be reimbursed with federal funds for the project. As a condition of federal funding, MoDOT was to be allowed to inspect the project. Under the terms of the contract between the City and MoDOT, MoDOT had the ability to withhold funding if it was not satisfied with the project. A provision of the contract between the City and Kerr Construction required Kerr Construction to grant access to representatives of MoDOT if they chose to inspect the work.

On June 17, 1992, a pre-construction conference was held between the parties who would be part of the project. Jerry Kerr, the owner and president of Kerr Construction, was not present, and Kerr Construction was instead represented by its superintendent, Terry Snelling. In addition to the various subcontractors and utilities, John Powell, the project coordinator for the City, and Doug Stewart, the project inspector for the City, attended the meeting. Steve Atkinson, the inspector assigned by MoDOT, also attended the meeting.

After the conference, Snelling failed to inform Kerr that an inspector from MoDOT would be on the project. Until the project was nearly completed, Kerr dealt exclusively with Stewart, the City inspector, and was not aware that there was a MoDOT inspector. Stewart checked the work on the project every step of the way and had regular discussions with Kerr and Snelling about the project.

On August 19, 1992, the City issued notice to proceed on the project. As the project neared its completion, Atkinson was reassigned, and Ghasson Khazin was assigned to take his place as MoDOT inspector, however, neither the City nor Kerr Construction was informed of this change until October 27, 1992.

After being assigned to the project, Khazin visited the project a few times when no work was being done. On October 20, 1992, Khazin again visited the project while no one was on the site. The asphaltic base course had been laid, and Khazin noticed some loose aggregate on top of the base course and some areas of irregularities. Khazin reported these observations to MoDOT and was told to inform the City of them. Khazin contacted Powell, who in turn contacted Stewart. Stewart told Powell that he was already aware of the situation and that Snelling had informed him that the loose aggregate would be swept off the base course and that the rest would be taken care of when the final asphalt surfacing was done.

On October 27, 1992, Khazin returned to the project site. When he arrived, nobody was there, but eventually Snelling drove up. Khazin had a brief discussion with Snelling and asked him when they were going to lay the asphalt. Khazin then left the project.

About one o'clock that afternoon, Khazin returned to the project site and parked in an adjacent, grassy area. When he arrived, a crew was preparing the equipment to lay the final layer of asphalt. Khazin saw Kerr and Snelling talking next to a car. Khazin walked up to the two men and said, "I don't like this," while pointing at the ground. Not knowing who Khazin was, Kerr tried to explain to him that it was just the base course and that it would look better once the final top was placed later that day. Khazin repeated, "I don't like this," and Kerr again explained that it was just the base course. Khazin then stated, "If you don't do better work, I'm going to make you tear it all out and do it all over again." When Kerr asked who Khazin was, Khazin replied, "I'm with the State, you dumb son of a bitch." Kerr then told Khazin that he could not talk to him like that and asked him to leave the site. Khazin said, "You can't tell me to leave the job. I'm state." Khazin also told Kerr he would shut the job down. Kerr again told Khazin to leave the site, turned his back, and walked away, leaving Khazin swearing at him. As Khazin drove away from the project site, he almost hit a member of Kerr's crew, who was forced to leap over a lowboy to get out of the way. After Khazin left, the loose

aggregate was swept off the base course and the surface lift was laid.

On the morning of October 28, 1992, while Kerr Construction was getting its equipment ready to finish the a small amount of surface paving it had left, Khazin returned to the project with his supervisor, Pete Waugh. Waugh was wearing a baseball cap bearing the insignia of Bowen Construction Asphalt Company, a competitor of Kerr Construction.

When Waugh and Khazin approached the job site, Kerr walked up to them. After Waugh introduced himself, Kerr repeatedly told him that he was welcome on the project, but Khazin would have to leave because he had endangered Kerr's employees and called him names. Kerr told Waugh that he could send out anyone else that he wanted to inspect the site.

After Kerr told Waugh that Khazin would have to leave, Khazin jumped in front of Waugh and began waiving his arms, yelling and swearing at Kerr. Khazin told Kerr that he did not have any right to kick him off the site. Waugh told Khazin to go back to the car, but Khazin continued to shout and waive his arms, one of which held a quart size, plastic coffee cup. Khazin told Kerr that his job was "no damn good" and that he was going to shut it down. At some point while Khazin was swearing and yelling, Khazin inadvertently hit Kerr in the nose with the coffee cup.

Kerr told Waugh to get Khazin off the project, and Waugh yelled at Khazin to get back in the car. Khazin started toward the car, but then came running back to yell at Kerr some more. Khazin eventually went to the car after Waugh again told him to go. When Khazin reached the car, he threw his coffee mug into the car.

Waugh told Kerr that Kerr Construction did not know what they were doing, that they did not do good work, and that Bowen Construction, whose hat he wore, should have gotten the construction job instead of Kerr Construction. Without having ever inspected the work that had been done on the project, Waugh told Kerr that he did not like the quality of the work and that he was going to make Kerr tear it out and shut the project down. Khazin and Waugh then left the site.

Shortly thereafter, Waugh and Khazin met with Powell, the City engineer, and Howard Penrod, the Director of Public Works for the City. Waugh told them that Kerr had repeatedly used foul language with them, that Kerr had threatened to have his men physically throw him and Khazin off of the site, that workers had picked up objects to hurt them, and that the City needed to get Kerr under control. Based on this report, Powell and Penrod ordered Stewart to stop work on the project. Penrod later testified that the project was shut down because Kerr Construction had violated its contract with the city by not allowing MoDOT to inspect the project and that he could not allow activity on a project where an inspector felt physically threatened for their safety. Both Powell and Penrod testified that had they known the information provided them by Waugh and Khazin was false, they would not have shut down the project.

About two hours after Waugh and Khazin left the project, Stewart arrived as the final truck was spreading the last of the surface asphalt. Stewart let the crew finish the load and roll it out before announcing that the job would have to be shut down. At that time, the only work that remained to be done on the project was the seeding, some minor grading, and the painting of a yellow line down the center of the road, all of which would have taken two to four hours. When Kerr asked Stewart why the project was being shut down, he said that two guys from the state had told the city that they were going to withdraw the state funds if the project was not shut down.

Kerr Construction was not allowed to finish the project and was not paid for the work it was not allowed to complete and for some of the work that it did complete.

On April 15, 1993, Kerr Construction and Jerry Kerr filed suit in the Circuit Court of Jackson County alleging tortious interference with a contract and defamation on the part of both Waugh and Khazin (Appellants) in addition to assault and battery on the part of

Khazin.[1] On March 5, 1996, the case went to trial before a jury. At the close of evidence, the plaintiffs dismissed their claims for defamation. On March 7, 1996, the jury returned a verdict in favor of Kerr Construction on its claim against Waugh and Khazin for tortious interference with a contract. The jury awarded $19,000 in actual damages and assessed punitive damages against each defendant in the amount of $7,500. The jury found in favor of Khazin and against Kerr on the assault and battery count. Appellants bring three points on appeal.

In their first point, Appellants claim that the trial court erred in not granting their motion for directed verdict, motion for judgment notwithstanding the verdict, and motion for new trial because Kerr Construction failed to present sufficient evidence to establish the necessary elements of tortious interference with a contract. All of these claimed errors boil down to whether the Kerr Construction made a submissible case of tortious interference with a contract.

■ "A claim for tortious interference with a contract or business expectancy requires proof of each of the following: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct." *Haas v. Town & Country Mortgage Co.*, 886 S.W.2d 225, 228 (Mo. App. E.D.1994). A plaintiff bears the burden of adducing substantial evidence supporting each and every element of this cause of action. *SSM Health Care, Inc. v. Deen*, 890 S.W.2d 343, 346 (Mo.App. E.D.1994). In assessing whether Kerr Construction has met this burden and made a submissible case, we must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to Respondents and disregard all evidence and inferences to the contrary. *Community Title v. Roosevelt Fed. Savs. & Loan Ass'n*, 796 S.W.2d 369, 371 (Mo. banc 1990). Appellants concede that the first two

elements, the existence of a contract and Appellants' knowledge of that contract, were established by the Respondents, however, they challenge the sufficiency of the evidence to support the remaining elements of Kerr Construction's claim.

Appellants initially challenge the evidence that they intentionally induced a breach of the contract between Kerr Construction and the City. Appellants claim that "[t]here was absolutely no evidence presented at trial by Respondent that either Khazin or Waugh actively and affirmatively told the City or even suggested to the City that it terminate its contract with Kerr Construction," and that Appellants had no power to shut down the project on their own. Appellants further suggest that Kerr Construction failed to present any evidence that Appellants were aware the City would issue a stop order based on their report, let alone terminate the contract.

■ Despite Appellants' contentions to the contrary, the evidence and the reasonable inferences drawn therefrom sufficiently establish that Appellants' report induced a breach of the contract between Kerr Construction and the City. The project was stopped within hours of Appellants' report to Powell and Penrod. The testimony of both Powell and Penrod established that their decision to shut down the project was based on the report made by Appellants. Penrod testified that had he known that the information relayed by the Appellants was inaccurate, he would have taken different steps with regard to shutting down the project. The contract was eventually terminated due to the City's misunderstanding of Kerr Construction's continued exclusion of the MoDOT inspector, Khazin, from the job site.

Appellants' intent to cause this result can reasonably be inferred from testimony indicating that both Khazin and Waugh threatened to have the project shut down and from their subsequent conduct in running to the City to relay a report containing what they knew to be false and misleading information.

1. Kerr Construction's claims alleging breach of contract on the part of the City were dismissed

prior to trial.

Furthermore, Waugh admitted that he knew that if the City believed that Kerr Construction would not let the State inspectors on the project pursuant to the contract, it would create problems. This evidence sufficiently established that Appellants intentionally induced a breach of the contract.

Appellants also assert that Kerr Construction failed to establish that any damages resulted from their conduct. Appellants claim that the most the evidence shows is that their report led to the stop order on the project, and that they cannot be held accountable for the fact that the City and Kerr never met to work out their problems. Appellants contend that it was the City's insistence that Khazin, the inspector assigned by MoDOT, be allowed to inspect the project and Kerr Construction's continued refusal to allow Khazin back on the job site which lead to the breach of contract, not their report. Appellants fail to recognize that but for their report, the problems between Kerr Construction and the City would not have arisen and the breach would not have occurred. Penrod testified that based on the report of Appellants, the City felt that Kerr Construction had breached the contract between them. Both Penrod and Powell testified that the project was shut down based on what they were told by Appellants. Kerr testified that as a result of the shut down, Kerr Construction was not allowed to finish the project and was not paid for the work left to be done or for some of the work that had already been done. Powell testified that as a result of the project being shut down, the City withheld money owed on the contract. Kerr construction sufficiently established that it suffered damages as a result of Appellants' report.

▆▆ Appellants further claim that Kerr Construction failed to establish that they acted without justification in making their report to the City. "Absence of justification is the absence of any legal right to take the actions about which the other party complains." *21 West, Inc. v. Meadowgreen Trails*, 913 S.W.2d 858, 870 (Mo.App. E.D. 1995). Appellants contend that they were acting under a qualified privilege when they reported to the City that they were unable to inspect the project. "A qualified privilege extends to 'all statements made bona fide in performance of a duty, or with a fair and reasonable purpose of protecting the interest of the person making them, or the interest of the person to whom they were made.'" *Fleischer v. Hellmuth, Obata & Kassabaum*, 870 S.W.2d 832, 838 (Mo.App. E.D.1993) (quoting *Kennedy v. Kennedy*, 819 S.W.2d 406, 410 (Mo.App. S.D.1991)). No doubt, state inspectors have a duty to report any concerns they have with the quality of a project or any problems they encounter in attempting to make an inspection to their superiors, however, qualified privilege only protects them if they act in a reasonable manner and for a proper purpose. *Century Management, Inc. v. Spring*, 905 S.W.2d 109, 112 (Mo.App. W.D.1995). "Unreasonable use of a privilege for an improper purpose, such as perpetrating a deliberate lie, will forfeit the privilege." *Id.* The evidence in the case at bar supported an inference that Appellants intentionally mislead Powell and Penrod when they made their report and that the report was merely a pretext to create problems for Kerr Construction. Accordingly, Appellants were not entitled to a qualified privilege for their actions. *See Franklin v. Mercantile Trust Co.*, 650 S.W.2d 644, 649 (Mo.App. E.D.1983).

▆▆ Appellants also claim that they acted justifiably to protect their own economic interests. Even assuming, *arguendo*, that Appellants, as agents of MoDOT, had an economic interest in the project to protect, their argument must fail. Protecting one's economic interests constitutes justification for interference with a contract or business expectation only if one does not employ improper means to protect that interest. *Beelman River Terminals v. Mercantile Bank*, 880 S.W.2d 903, 908 (Mo.App. E.D.1994). In the context of intentional interference with contractual relations, improper means are those which are independently wrongful, including threats, violence, trespass, defamation, restraint of trade, and misrepresentation of fact. *Xavier v. Bumbarner & Hubbell Anesthesiologists*, 923 S.W.2d 428, 433 (Mo. App. W.D.1996) (quoting *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 317 (Mo. banc 1993)). False statements tending to

prejudice or injure a person in the person's business, by suggesting the person is unreliable, insolvent, or the like, are independently actionable and constitute an improper means. *21 West, Inc. v. Meadowgreen Trails,* 913 S.W.2d 858, 870 (Mo.App. E.D.1995). As already noted, *supra,* Kerr Construction presented sufficient evidence to support a conclusion that Appellants intentionally misrepresented the facts when they made their report to the City, and in so doing, they used improper means. Consequently, Kerr Construction sufficiently established Appellants' lack of justification.

Kerr Construction presented sufficient evidence to establish all of the elements necessary to maintain an action for intentional interference with a contract. Accordingly, the trial court did not err in denying Appellants' motions for directed verdict, judgment not withstanding the verdict, and new trial. Point denied.

In their second point, Appellants claim the trial court erred in submitting Kerr Constructions' claim for punitive damages to the jury.[2] Appellants claim that Kerr Construction failed to present sufficient evidence that their conduct was outrageous due to an evil motive or reckless indifference to the rights of others.

Appellants initially claim that the clear and convincing evidence standard set forth in *Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104, 111 (Mo. banc 1996), should be applied to this case. In *Rodriguez,* the Missouri Supreme Court changed the burden of proof for punitive damages from the preponderance of the evidence standard to the higher standard of clear and convincing evidence. *Id.* However, in regard to the applicability of the new standard, *Rodriguez* expressly states:

This change in the common law relates to requirements at trial, which are procedural and apply prospectively only. The clear and convincing standard of proof for punitive damages shall apply to this case, all cases in which trial begins after February 1, 1997, and all pending cases in which a proper objection has been preserved.

*Id.* (citations omitted).

■ The case at bar was tried from March 4–7, 1996, well before *Rodriguez* was handed down,[3] however, Appellants claim that their general challenges to the submission of punitive damages to the jury constitutes a properly preserved objection. During the instruction conference, Appellants objected to the punitive damage instruction "on the grounds there has been no evidence in the case to support any kind of outrageous conduct, evil motive, or reckless indifference on the parts of either defendant." In their Motion for Judgment Notwithstanding the Verdict and Motion for New Trial, Appellants merely state that judgment should be entered in favor of Appellants because "Plaintiff's evidence fails to establish that Defendants' actions were outrageous because of Defendants' evil motive or reckless indifference to the rights of others." These general objections to the submission of the punitive damage instruction to the jury were not specific enough to constitute a proper objection to the burden of proof under which the jury was charged with considering punitive damages, and as such, fail to properly preserve the issue for treatment under *Rodriguez.* Rule 70.03;[4] *See also Gilmore v. Chicago Title Ins. Co.,* 926 S.W.2d 695, 700 (Mo.App. E.D.1996) ("Where an alleged error relating to an instruction differs from the objections made to the trial court, the error may not be reviewed on appeal.").

2. On the issue of punitive damages, the jury was instructed: "If you find the issues in favor of plaintiff Kerr Construction, and if you believe the conduct of defendants Ghasson Khazin and/or Walter W. Waugh ... was outrageous because of defendants Ghasson Khazin's and/or Walter W. Waugh's evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiff Kerr Construction entitled ... you may award plaintiff Kerr Construction an additional amount as punitive damages ..."

3. *Rodriguez* was handed down on December 17, 1996.

4. "No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Rule 70.03.

Under the preponderance of the evidence standard in effect at the time of trial, it was "well settled by Missouri law that 'a submissible punitive damage question is made for the jury once the plaintiff has presented sufficient evidence of legal malice— the intentional doing of a wrongful act without just cause or excuse.'" *Boyer v. Grandview Manor Care Ctr.*, 759 S.W.2d 230, 235 (Mo.App. W.D.1988). Therefore, if a submissible case was made on a tortious interference claim, then the elements for submitting the issue of punitive damages to the jury were also present. *Id.* As noted, *supra,* the evidence supported the submission of Kerr Construction's tortious interference claim, and therefore, the trial court did not err in submitting the punitive damages claim to the jury. Point denied.

In their final point, Appellants claim that the trial court erred in not granting a new trial because the verdict was excessive in light of the evidence produced at trial. The bulk of Appellants' argument proceeds to assert that a new trial is warranted because the "excessive verdict" resulted from prejudice and bias on the part of the jury.[5] This claim is not mentioned in Appellants' point relied on, and is therefore not preserved for review. *Smith v. Tang,* 926 S.W.2d 716, 719 (Mo.App. E.D.1996).[6] Moreover, no mention of Appellants' prejudice or bias claims was made in their motion for new trial. "When an allegation of error on appeal does not correspond to any point in the motion for new trial, nothing is preserved for our review." *Ayers v. Aurora Enterprises, Inc.,* 899 S.W.2d 913, 914 (Mo.App. S.D.1995). Accordingly, Appellants' claims relating to prejudice and bias on the part of the jury are not preserved for our review. Rule 78.07.

Turning to Appellants' claim that the verdict exceeded the evidence presented at trial, Appellants claim that while the jury awarded Kerr Construction $19,000 in actual damages, "by plaintiff's own admission they suffered at most $18,615.43," a difference of

$384.66. The Appellants claim that they are entitled to a new trial or remittitur based on this excessive verdict. The determination of damages is primarily for the jury. *Bishop v. Cummines,* 870 S.W.2d 922, 923 (Mo.App. W.D.1994). The trial court may reduce the jury award by remittitur "if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiffs injuries and damages...." *Fust v. Francois,* 913 S.W.2d 38, 49 (Mo.App. E.D. 1995) (quoting § 537.068, RSMo 1994). The trial court has broad discretion in making that decision, and an appellate court "will interfere only when the verdict is so grossly excessive that it shocks the conscience of the court and convinces the court that both the jury and the court abused their discretion." *Id.* We will only interfere with the judgment of the jury and the trial court if the verdict is manifestly unjust. *Id.*

Appellants argument is without merit. The evidence at trial revealed either a dispute, or confusion, as to the amount of damages, ranging from an approximated low of $18,615.43 to a high of $27,027.32. After beginning their deliberations, the jury sent a question to the trial judge asking what the actual damages requested by the plaintiffs were. The judge replied that the jury would have to rely on its own collective memory of the evidence to establish actual damages. Based on their collective recollections of the testimony, the jury returned a verdict within $400 of the approximated amount of actual damages at the low end of the evidentiary spectrum. The verdict is supported by the record and is certainly not manifestly unjust. Point denied.

The judgment is affirmed.

All concur.

5. Appellants cite to *Sparks v. Consolidated Aluminum Co.,* 679 S.W.2d 348, 352 (Mo.App. E.D. 1984) for the proposition that a new trial is warranted where a jury returns a verdict in excess of the damages testified to as a result of prejudice and bias.

6. "Issues not encompassed by the point relied on and raised only in the argument portion of the brief are not preserved for review." *Smith v. Tang,* 926 S.W.2d 716, 719 (Mo.App. E.D.1996).